**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Raymond Leroy TALKINGTON, Defendant–Appellant.**

No. 87–1672.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1988.

Decided May 17, 1989.

Rehearing Denied June 30, 1989.

Diana N. Cherry, Metnick & Barewin, Springfield, Ill., for defendant-appellant.

J. William Roberts, Asst. U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS, FLAUM, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This case is before the court for the second time. Therefore, we shall not repeat the basic facts of the case. A complete rendition can be found in our earlier opinion. *See United States v. Talkington*, 843 F.2d 1041 (7th Cir.1988). At that time, we determined that the state of the record and the findings of the district court did not afford us an adequate basis for review of the defendant's contentions that the search of his home was unconstitutional. Therefore, while retaining jurisdiction, we directed the district court to develop further the record with respect to this matter. Pursuant to that direction, the district court held a hearing and made, on the basis of that hearing, supplemental findings of fact and conclusions of law. *United States*

*v. Talkington,* 701 F.Supp. 681 (C.D.Ill. 1988) (opinion) [hereinafter Supp. op.]. Upon receipt of this report of the district court, we permitted the parties to file supplemental briefs. The case is now before us for decision. We affirm the judgment of conviction.

## ANALYSIS

### A. *The Fourth Amendment Claims*

■ In our earlier opinion, we noted that the appellant's attack on the constitutionality of the search of his home involved two separate questions: 1) the constitutionality of the initial warrantless entry into the home; and 2) the voluntariness of the subsequent consent to search the home executed by Mr. Talkington sometime after the initial entry. 843 F.2d at 1044–49. We shall address each of these issues separately. However, as an initial matter, we stress that, in reviewing the factual findings of the district court at a suppression hearing, the standard of review is clear error. *United States v. Oglesby,* 764 F.2d 1273, 1278 (7th Cir.1985). As a general proposition, therefore, we are obliged to accept as not clearly erroneous the findings of fact of the district court, as long as they are *supported by the record.* Indeed, it was our recognition of the appropriate role of trial and appellate courts with respect to factual determinations that prompted our decision to require further amplification of the record. Unfortunately, the district court did not accept this additional task in the spirit in which it was imposed and its supplemental findings exhibit an extraordinary manifestation of pique. Consequently, and regrettably, we have deemed it necessary not only to review these findings to ensure that they are supported by the record but also to assure ourselves that they are the product of dispassionate judicial analysis. The following conclusions are based on an exhaustive analysis in which we carefully reviewed the record of the supplemental proceedings and compared it to that of the initial proceedings at trial.

### 1. The Warrantless Entry into the Home

■ In our initial opinion, we identified several areas of concern with respect to whether the initial warrantless entry into the home was justified by exigent circumstances. We noted that it was not clear whether the agents had a reasonable apprehension that evidence was being destroyed at that time. It was not clear whether, under the circumstances prevailing at the time, the agents had a reasonable opportunity to procure, telephonically or otherwise, a search warrant. Finally, we expressed concern as to whether the warrantless entry was a subterfuge designed to facilitate obtaining consent to search from the defendant. 843 F.2d at 1046–47. In its supplemental findings, the district court found that the warrantless entry was ordered because the agent in charge had grounds to believe that evidence was being destroyed. The district court further detailed the information known to the agent at the time the decision was made. 701 F.Supp. at 684.

The record provides ample support for the district court's conclusions. The agent in charge was aware of earlier talk of burning the counterfeit money among those under suspicion. He knew that there was a fire in the backyard and that there was no known reason for the fire. R. 150 at 16–27. He knew that there was counterfeit money in the house and that Mr. Talkington wanted to get rid of it. This agent also had reasonable grounds to fear that the surveillance of the residence had been detected by the occupants. The district court also determined that, given the geographic dispersion of the officers, there was insufficient time to procure a warrant. 701 F.Supp. at 685. Our independent review of the record convinces us that the determination of the district court is not clear error. The record similarly refutes Mr. Talkington's challenge to the district court's finding that the initial entry was not a subterfuge for the procurement of the later consent to search by Mr. Talkington. *See* at 686; *see also* R. 152 at 304; R. 155 at 552–57. Accordingly, we believe that the findings of the district court support a determination that there were exigent circum-

stances that justified the warrantless entry into the home of Mr. Talkington.

### 2. The Voluntariness of the Consent to Search

■ In our initial opinion, we expressed concern about the state of the record with respect to whether Mr. Talkington's consent to search the premises could be considered voluntary. 843 F.2d at 1048. We expressed particular concern as to whether the agent's threat to search the person of Mrs. Talkington (who was not a suspect) might have rendered the consent involuntary.

Here, the findings of the district court in response to our remand are somewhat problematic. *See* 701 F.Supp. at 686–688. Ordinarily, whether consent to a search is voluntary "is a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The district court's analysis, however, manifests a marked lack of focus on the totality of circumstances, and an inordinate stress on tangential matters. In its initial ruling on the consent to search, the district court did not address the question of voluntariness, although it was clearly the principal objection of the defendant. *See* R.86 at 282 (suppression hearing). Moreover, shortly before the consent ruling, the district court commented that the Talkingtons were "terrorized" by the entry of the officers into their home. *Id.* at 280. In its supplemental findings after remand, the district court again skirts the issue of Mr. Talkington's voluntariness in consenting to the search. It instead makes much of the fact that the officers made known their intention to "search," as opposed to "body search," the person of Mrs. Talking-

ton. At 687–689. Yet, the district court does not deny and indeed confirms that, before consenting to the search of the premises, Mr. Talkington was aware of the intention of the officers to search the person of his wife and that, in agreeing to waive his *Miranda* rights and in agreeing to consent to the search of the premises, Mr. Talkington first requested that, in return, the officers "go easy on Betty." At 683. Under these circumstances, the conclusion of the district court that "[t]he record reflects no treatment of Mrs. Talkington (standing alone or in combination) which had the effect of coercing Mr. Talkington to voluntarily consent to the search of 409 Amherst," 701 F.Supp. at 688, is not self-evident. Indeed, given the degree of scrutiny required in our review of this particular case, it would indeed be difficult to say that this conclusion is fairly supported by the record.

It is not necessary, however, for us to resolve definitively this difficult question. The initial entry into the house, which we determined as having conformed to constitutional standards, *supra* Part A.1., produced sufficient evidence of counterfeit money to support the judgment of conviction. After the entry, an agent was instructed to observe Mr. and Mrs. Talkington to prevent the destruction of evidence. The agent then noticed the defendant make a furtive movement into the seat cushion of his chair; fearing that the defendant was reaching for a weapon, the agent ordered Mr. Talkington to rise. The agent then searched the chair and found a roll of counterfeit bills. R.88 at 220–22. Under these circumstances,[1] we find it unnecessary to determine definitively whether the record can be said to support the determination of the district court that the appellant con-

---

**1.** In the supplemental proceedings, the district court noted that Agent Fermon testified that he noticed five bags of counterfeit money during the initial "sweep search" of the house immediately after entry. 701 F.Supp. at 688. The district court accepted this testimony without any recognition that the agent's testimony at the original suppression hearing contained no such reference. *Compare* R.85 at 144–46 (suppression hearing) with R.155 at 548–51 (supplemental proceeding).

We decline to base our analysis on the agent's revised recollection of events during the sweep search. The government originally offered the bags as a product of the consent search. *See* R.85 at 111. It must live with that decision. The limited remand was not intended to permit the government to alter the entire basis for the admission of evidence at trial. It was meant only to permit clarification of the basis which was relied upon.

sented voluntarily to the search of the premises.[2]

██ One last matter must be addressed before leaving this issue. The record reveals that at least some of the government agents who participated in this operation were under the misapprehension that Mr. Talkington's consent to the search of the premises somehow amounted to permission to search his wife's person as well. 701 F.Supp. at 684. Since this question was not squarely before the district court, we cannot fault it for not correcting the misapprehension through any extensive treatment of the matter. However, because the district court's supplemental opinion can be misinterpreted as condoning such a misunderstanding, see id., we point out that such a proposition is simply unsupportable. It ought not govern the action of the government in future cases.

### B. The Trial Error Claims

#### 1. The Ostrich Instruction

██ Mr. Talkington also submits that the district court committed reversible error when it instructed the jury that:

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word.

R.60; see also R.93 at 1605–06. In Mr. Talkington's view, the evidence at trial did not raise an issue which would justify the giving of this instruction. Moreover, he submits, the instruction was confusing to the jury. Appellant's Br. at 37. In support of his argument, he submits that his

defense at trial was not that he was unaware of the presence of the counterfeit money, but that he did not share the intent to defraud which is an element of the offense of possessing counterfeit money. See 18 U.S.C. § 472; see also United States v. Chisem, 667 F.2d 1192, 1193 (5th Cir.1982). He argues that the giving of this instruction, combined with an aider and abettor instruction, could lead the jury to conclude that guilt could be established without proving that he had the intent to deceive. Appellant's Br. at 41. The government counters that there was a genuine issue in the case with respect to the defendant's knowledge of the counterfeiting activities of his son. For example, Mr. Talkington's primary lines of defense were the claims that he was duped into giving his son funds to purchase counterfeit money, R.92 at 1298–1303; R.94 at 1725, and that he was oblivious to the fact that his son was using Mr. Talkington's residence to store this counterfeit currency. See R.92 at 1323–25. In the government's view, the jury was entitled to conclude that Mr. Talkington's claimed ignorance of his son's activities amounted to studied avoidance of full knowledge of his son's use of Mr. Talkington's home as a "stash house" and therefore constituted conduct designed to aid in the success of the illegal venture. Government's Br. at 44–45. See United States v. Beck, 615 F.2d 441 (7th Cir.1980).

While suggesting that the matter is usually better left to the argument of counsel rather than to formal jury instructions, see United States v. Ramsey, 785 F.2d 184, 191 (7th Cir.), cert. denied, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986), we have not held that it is always error to give the instruction. However, we have cautioned that "this instruction, like all instructions, should be given only when it

2. As the Ninth Circuit noted in United States v. Rodriguez, 761 F.2d 1339 (9th Cir.1985):

To support a conviction for possession of counterfeit currency with intent to defraud under 18 U.S.C. § 472, the government must prove three elements: (1) possession of counterfeit money; (2) knowledge, at the time of possession, that the money is counterfeit; and (3) possession with intent to defraud.

761 F.2d at 1340. Both knowledge and intent can be inferred from the surrounding circumstances. United States v. Rice, 652 F.2d 521, 526 (5th Cir.1981). The appellant's attempt to secrete the roll of bills in the chair is certainly circumstantial evidence of both knowledge and intent. See United States v. Gonzalez, 617 F.2d 104, 106 (5th Cir.) (defendant hid roll of counterfeit bills while under arrest), cert. denied, 449 U.S. 868, 101 S.Ct. 202, 66 L.Ed.2d 86 (1980).

addresses an issue reasonably raised by the evidence." *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir.1988). "A conscious avoidance instruction is 'properly given only when the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.'" *United States v. White*, 794 F.2d 367, 371 (8th Cir.1988) (quoting *United States v. McAllister*, 747 F.2d 1273, 1275 (9th Cir.1984), *cert. denied*, 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985)). As we stated in *Diaz*,

> [t]he ostrich instruction has been principally employed where there is evidence that the defendant is associated with a group, but where there is also evidence that the defendant consciously was avoiding knowledge of the illegal nature of the group's activity. In most cases, the defendant acknowledges his association with the group but, despite circumstantial knowledge to the contrary, denies knowledge of the group's illegal activity.

864 F.2d at 550.

This case does not fit neatly into the above description because, other than his familial relationship with his son, Mr. Talkington denies any association with his son and his confederates. While the need for the instruction is questionable, we cannot say that the district court committed error in deciding to give it. In reviewing the decision of a district court to give the instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government. *United States v. Johnson*, 605 F.2d 1025, 1028 (7th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). "An ostrich instruction informs the jury that actual knowledge and deliberate knowledge are the same thing." *Ramsey*, 785 F.2d at 189. Arguably, understanding this concept would assist the jury in determining whether Mr. Talk-

ington possessed the requisite intent to deceive by cooperating in the counterfeiting operation of his son. Certainly, we do not think there is a reasonable possibility that, on this record, the jury was misled as to the state of the law or its obligations.

### 2. The Note to the Jury

■ The jury retired to deliberate at approximately 2:00 p.m. on a Friday afternoon. At 10:00 p.m., without prior notice to counsel, the district court sent a note to the jury room. The note asked the jury whether it preferred to deliberate for an additional hour or to adjourn and to continue its deliberations the following day.[3] Mr. Talkington submits that this note had the potential for serving as a "dynamite instruction." Appellant's Br. at 42. Relying on this court's holding in *United States v. Chaney*, 559 F.2d 1094 (7th Cir.1977), he characterizes the note as telling the jury that it had one hour to reach a verdict "to avoid being held through the weekend." Appellant's Br. at 43. The government agrees that the district court committed error. It argues, however, that the error is harmless. It notes that there is nothing in the record to indicate that the note coerced the jury. Here, argues the government, the note can be interpreted in only one way—as giving the jury an opportunity to continue for another hour or to suspend their deliberations and return fresh the next day to continue deliberations. Government's Br. at 47.

There can be no doubt that the communication with the jury without consulting counsel was error. As the Supreme Court wrote in *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954):

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presump-

---

**3.** The note that the district court wrote to the jury stated that:

> *Members of the Jury*
>
> You have been deliberating since about 2:00 P.M. Do you wish to:
>
> X 1. Continue deliberating for another hour?

or

— 2. Go either home or to a hotel for the evening and continue deliberating tomorrow morning at 10:00 A.M.?

R.58.

tively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*See also Buckhana v. Lane,* 787 F.2d 230, 236 (7th Cir.1986). As this court noted in *United States v. Widgery,* 778 F.2d 325 (7th Cir.1985):

Both incidents [of a court's *ex parte* communications with the jury] were regrettable. Fed.R.Crim.P. 43(a) gives the defendant a right to be present at every stage of the trial, and this requires the court to share with defendant notes from the jury. Notes should be examined and answers given in open court. To answer a note without consulting counsel may spoil a perfectly good trial for several reasons—not only because it denies defendant a procedural right but also because consultation may help the court to cure a genuine problem in the deliberations before it is too late. A response arrived at after hearing from the parties is more likely to be accurate than one delivered on the spur of the moment.

778 F.2d at 327 (citations omitted). At the same time, the Supreme Court has emphatically held that such an error can be harmless. *Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam). We are convinced that, in the situation before us, the error was in fact harmless. The note sent to the jurors here was certainly different from the communication at issue in *Chaney.* We do not think it reasonably can be construed as having placed undue pressure on the jurors. Therefore, while we do not condone the practice employed here, we do not believe that it requires reversal of the conviction.

## CONCLUSION

We have thoroughly examined, on two occasions, the contentions of the appellant and the record of the proceedings in the district court. It was not a trial without difficulties. Nevertheless, our obligation is complete when we determine that those infirmities did not prejudice substantially the rights of the defendant. Accordingly, the judgment of conviction is affirmed.

AFFIRMED.